**United States District Court**
**Northern District of Alabama**
**Southern Division**

03 JUN -3 PM 2:41

DISTRICT COURT
N.D. OF ALABAMA

| | |
|---|---|
| Michelle Sloan, | ] |
| Plaintiff(s), | ] |
| vs. | ] CV-02-CO-0804-S |
| Colonial Properties Trust, | ] |
| Defendant(s). | ] |

ENTERED
JUN 0 3 2003

**Memorandum of Opinion**

## I. Introduction.

Presently before the court is a motion for summary judgment, filed by the defendant on January 31, 2003. [Doc. # 42.] The issues raised therein have been fully briefed by the parties and are now ripe for decision. Upon due consideration, the court is of the opinion that the motion for summary judgment is due to be granted.

## II. Facts.[1]

The plaintiff, Michelle Sloan ("Ms. Sloan"), has a mild form of epilepsy that is satisfactorily controlled by medication. She has not had an epileptic seizure in approximately twenty-two years. She was hired by the defendant, Colonial Properties Trust ("Colonial") in or around June 2000, as a leasing agent at one of Colonial's apartment home communities. Her initial rate of pay was $8.00 per hour.

---

[1] The facts set out below are gleaned from the parties' submissions of facts claimed to be undisputed, their respective responses to those submissions, and the court's own examination of the evidentiary record. All reasonable doubts about the facts have been resolved in favor of the nonmoving party. *See Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002). These are the "facts" for summary judgment purposes only. They may not be the actual facts. *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).

After three or four months in that position, in or around September 2000, Ms. Sloan moved to a job as a secretary, in which position she continued to earn $8.00 per hour. Within a few weeks, Ms. Sloan was promoted to the position of resident retention specialist, in which position she received a pay raise to $8.50 per hour plus commissions. In late October 2000, Colonial promoted Ms. Sloan to a vacant assistant property manager position, and she received a pay increase to $12.00 per hour. At the time of her promotion to assistant property manager, Colonial was aware that Ms. Sloan had a seizure disorder and that she was taking medication to control the condition.

In the latter part of January 2001, while Ms. Sloan was in the leasing office by herself, she "blacked out" as she was walking away from her desk. Her knees buckled causing her to fall. She was not injured, and there were no witnesses to the fall. After that incident, she requested a meeting with human resources to discuss the fall and to explain that she was okay. Ms. Sloan explained at the meeting that her physician had been adjusting her epilepsy medication since October 2000, and that her fall in January was caused by the medication. However, her new medication had stabilized by early-February 2001. Up to the time she blacked out at work, Karen Wigley ("Ms. Wigley"), the District Manager, had not received any complaints about Ms. Sloan's performance; furthermore, Ms. Wigley noted that this incident "was the first time anything regarding a disability . . . popped up with regard to Michelle Sloan." (Wigley Dep. at 15.) After this incident, in March 2001, Tony Fitzwater ("Mr. Fitzwater"), who was Ms. Sloan's direct supervisor from October 2000, until approximately mid-March 2001, contacted Ms. Wigley about Ms. Sloan's job performance and explained that there were a number of issues that needed to be addressed with Ms.

Sloan, including some with regard to her job duties. On March 7, 2001, Ms. Wigley and Mr. Fitzwater met with Ms. Sloan to go over her job duties and to discuss her job performance. Mr. Fitzwater left the company sometime after March 7, 2001, and, for the month or so that it took to fill his position, Ms. Sloan ran the office in which she worked by herself. Although she was not Ms. Sloan's supervisor and did not evaluate her during that one-month interim period, Ms. Wigley believed Ms. Sloan performed "okay" under the circumstances. However, Ms. Wigley noted that during that time period, "[t]here were some issues." (Wigley Dep. at 30.)

In April 2001, Deanna Wilson ("Ms. Wilson"), who had worked for several years at another of Colonial's properties, was transferred to the position vacated by Mr. Fitzwater and became Ms. Sloan's direct supervisor. Ms. Wigley considers Ms. Wilson one of the best two general managers (out of approximately twelve to fifteen) she has supervised in her years at Colonial. Ms. Wilson had no knowledge that Ms. Sloan blacked out at work one day in January 2001, nor was she aware that Ms. Sloan had a period of adjustment to new medicine in late-2000, and early-2001.When Ms. Wilson reported to the office that had been run by Ms. Sloan for about a month, she found the office to be in total disarray and concluded that "things were not being done properly." (Wilson Dep. at 43.) Ms. Sloan admits that the office was in total disarray at that time. (Sloan Dep. at 102.) Ms. Wilson was pregnant and expected to be taking a three-month maternity leave from work sometime late in 2001. However, after several weeks of working with Ms. Sloan, Ms. Wilson became concerned that Ms. Sloan could not effectively perform everyday tasks and run the office by herself while Ms. Wilson was on maternity leave. Toward the end of May 2001, it became

clear to Ms. Wilson that Ms. Sloan was "very forgetful of how to do what was expected of her." (Wilson Dep. at 26.)

On May 17, 2001, Ms. Wilson met with Ms. Sloan and explained to her that she needed to be "trained on all tasks for everyday operations by the end of June" because Ms. Wilson was concerned about her pending maternity leave and Ms. Sloan's ability to run the office by herself. (Sloan Dep. at 104.) No other assistant manager had been given such a requirement before; however, the situation with Ms. Sloan was unique due to Ms. Wilson's anticipated maternity leave. Ms. Wilson indicated that she did not want to return to an office in disarray. (Sloan Dep. at 153.) About that time, Ms. Wilson purchased a notebook in which Ms. Sloan could record all of her job duties and how and when to perform them so that she could reference the notebook whenever she forgot how to do something. Ms. Wilson also "spent a lot of time with" Ms. Sloan, training her on a new computer program called MRI, and training her with respect to other aspects of her job as an assistant property manager. (Wilson Dep. at 23.) Although she felt somewhat better about the MRI program due to Ms. Wilson's training, by June 5, 2001, Ms. Sloan indicated that Ms. Wilson was helping her but she was still confused. By the end of June 2001, Ms. Wilson had trained Ms. Sloan on office procedures for two months; Ms. Wilson testified that she had never worked with an assistant manager who required as much assistance as Ms. Sloan.

On June 26, 2001, Ms. Wilson met with Ms. Sloan and explained that she was going to let Ms. Sloan run the office by herself for a month to see if she was capable of doing the job while Ms. Wilson was on maternity leave. After a few days of running the office, Ms. Sloan went to Ms. Wilson on July 2, 2001, and told her that she did not think she could

perform all of her job duties. She told Ms. Wilson that "[t]here is probably 80 percent I can do but 20 percent is rocky." (Sloan Dep. at 151-52.) Additionally, Ms. Sloan told Ms. Wilson that she was not sure she could run the office by herself during Ms. Wilson's maternity leave, and asked Ms. Wilson if there were any available positions to which she could be transferred, with specific interest in receptionist or leasing agent positions. After checking on available positions, on July 3, 2001, Ms. Wilson offered Ms. Sloan the only available jobs at the time, which were in the housekeeping departments of two of Colonial's properties. Ms. Wilson explained that if she took one of the housekeeping jobs, Ms. Sloan would be eligible to apply and interview for a leasing consultant position when one became available.

On July 5, 2001, Ms. Sloan told Ms. Wilson she did not want either of the available housekeeping jobs, but instead wanted to continue to try to do the assistant property manager's job. Ms. Wilson told Ms. Sloan that her employment would be terminated because she turned down the only available jobs after admitting on July 2, 2001, that she could not do the assistant property manager job 100 percent. Ms. Wilson terminated Ms. Sloan's employment on that date. In late-July or early-August 2001, Ms. Wilson hired Melissa Forehand ("Ms. Forehand") to fill the vacant assistant property manager position. Notably, Ms. Forehand also has an epileptic condition that is controlled by medication.

During her employment with Colonial, Ms. Sloan was in no way limited, either physically or mentally, by her seizure disorder. Ms. Sloan never complained about discrimination or harassment during her employment with Colonial. However, on September 4, 2001, she filed a charge of discrimination with the EEOC. She filed her complaint in this action on March 29, 2002, alleging one count of discrimination under the

Americans with Disabilities Act, 42 U.S.C. §§ 12101-12213 ("ADA" or "the Act"). Specifically, Ms. Sloan alleges that she was terminated from her employment because Colonial perceived her seizure disorder to be a disability within the meaning of the Act. Colonial filed the instant motion for summary judgment on January 31, 2003, alleging that there is no genuine issue of material fact, and Colonial is entitled to judgment as a matter of law.

### III. Standard.

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the evidence] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant can meet this burden by presenting evidence showing that there is no genuine dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Celotex*, 477 U.S. at 322-23. In evaluating the arguments of the movant, the court must view the evidence in the light most favorable to the nonmoving party. *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996).

Once the moving party has met his burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a

genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)). "A factual dispute is genuine only if a 'reasonable jury could return a verdict for the nonmoving party.'" *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002) (quoting *United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1437 (11th Cir. 1991)).

### IV.   Discussion.

Ms. Sloan claims she was wrongfully terminated in violation of the ADA, which provides that "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to . . . the . . . discharge of employees, employee compensation, . . . and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). To prevail under the ADA, Ms. Sloan must prove a prima facie case of disability discrimination by showing: (1) she has a disability, as that term is defined under the ADA; (2) she is qualified to serve in her former position at Colonial, either with or without some reasonable accommodation; and (3) she has suffered an adverse employment action because of her disability. *Doe v. DeKalb County Sch. Dist.*, 145 F.3d 1444, 1445 (11th Cir. 1998); *Smith v. Ala Dep't of Corr.*, 145 F. Supp. 2d 1291, 1300-01 (M.D. Ala. 2001). In the absence of direct evidence, Ms. Sloan can establish the third element of her prima facie case by showing that (1) she was terminated from her position; and (2) the position remained open and was ultimately filled by a person without a disability as defined under the ADA. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 508 (1993) (Title VII case); *Wascura v. City of South Miami*, 257 F.3d 1238, 1242 (11th Cir. 2001) ("[A] plaintiff may establish a prima facie case of an ADA violation through circumstantial evidence using

the familiar burden-shifting analysis employed in Title VII employment discrimination cases.").

If Ms. Sloan succeeds in establishing her prima facie case of discrimination, the defendant must articulate a legitimate, non-discriminatory reason for terminating her. *Wascura*, 257 F.3d at 1242. Once the defendant articulates such a reason, "the presumption of discrimination is eliminated and 'the plaintiff has the opportunity to come forward with evidence . . . sufficient to permit a reasonable factfinder to conclude that the reason[ ] given by the employer [was] not the real reason[ ] for the adverse employment decision,'" but is mere pretext for unlawful discrimination. *Chapman v. AI Transport*, 229 F.3d 1012, 1024 (11th Cir. 2000) (en banc) (quoting *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997)).

### A. Prima facie case.

Ms. Sloan must first establish that she suffered from a disability within the meaning of the ADA. The ADA defines disability as: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of an individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2). Ms. Sloan seeks to establish her ADA claim under only the third definition of disability; she claims the defendant regarded her as being disabled due to her epileptic condition.

Ms. Sloan can prove that she was regarded as being disabled by showing that the defendant mistakenly believed either that she had a physical impairment that substantially limited one or more major life activities, or that an actual, nonlimiting impairment

substantially limited one or more major life activities. *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 489 (1999). In either scenario, "it is necessary that [the defendant] entertain[ed] misperceptions about the individual . . . . These misperceptions often 'result from stereotypic assumptions not truly indicative of . . . individual ability.'" *Sutton*, 527 U.S. at 489 (quoting 42 U.S.C. § 12101(7)).

Ms. Sloan alleges the defendant regarded her nonlimiting seizure disorder as an impairment that substantially limited her in the major life activity of working. To succeed on this theory, Ms. Sloan must establish that the defendant believed her impairment "generally foreclos[ed] the type of employment involved, not just a narrow range of job tasks." *Gordon v. E. L. Hamm & Assocs., Inc.*, 100 F.3d 907, 913 (11th Cir. 1996). *See also Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1285 (11th Cir. 1997) ("When individuals claim that they are [regarded as] substantially limited in the major life activity of 'working,' their condition 'must significantly restrict [their] ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills, and abilities.'") (citation omitted). Indeed, the employer's perception that the employee is unable "to perform a single, particular job does not [indicate the employer perceived the impairment as causing] a substantial limitation in the major life activity of working." *Gordon*, 100 F.3d at 912.

Ms. Sloan's argument with respect to this element of her prima facie case is that, prior to her fall at work, her employer had no problems with her job performance; however, thereafter Mr. Fitzwater complained about her job performance, she was given a deadline by which she had to know how to perform all of her job tasks, and she was ultimately

terminated. The court is of the opinion that this evidence does not establish that her employer regarded her as significantly limited in the major life activity of working. Rather, the evidence indicates that Colonial regarded Ms. Sloan as perfectly capable of performing a number of jobs within the company; indeed, immediately prior to her termination, Colonial offered her an open position as a housekeeper with the ability to apply for a leasing consultant position when one became available.[2] Because jobs utilizing her skills were available and were offered to her by the defendant, it is clear that the defendant did not regard her as having a disability within the meaning of the ADA. *See Cash v. Smith*, 231 F.3d 1301, 1307 (11th Cir. 2000) ("Not only were jobs utilizing [the plaintiff's] skills available, but [the defendant] was in fact employing [the plaintiff] in such a job at the time of the actions complained of, and it continued to do so.").[3]

Furthermore, it is undisputed that Colonial knew of Ms. Sloan's seizure disorder prior to promoting her to the assistant property manager position; this fact belies any claim that Colonial perceived Ms. Sloan to be disabled. *See Pew v. The Evangelical Lutheran Good Samaritan Society, Inc.*, No. 98-36004, 2000 U.S. App. Lexis 4058, at *4-*5 (9th Cir. 2000) (finding that the employer did not regard the employee as being substantially limited in the

---

[2] The court is of the opinion that the evidence that Ms. Sloan was promoted a number of times and then began to receive negative job performance reports supports the so-called Peter Principle, rather than a finding of disability discrimination. The Peter Principle is a theory that states that "employees within an organization will advance to their highest level of competence and then be promoted to and remain at a level at which they are incompetent." The American Heritage Dictionary of the English Language (4th ed. 2000). The fact that Ms. Sloan was promoted to the level at which she was incompetent shortly before she fell at work is merely a coincidence.

[3] As for the requirement that she be able to perform all of her job duties by a certain date, it is clear to the court that this requirement arose not because of some perceived disability, but because Ms. Sloan was in the unique position of having to run the office by herself during her supervisor's twelve-week maternity leave. It was absolutely reasonable, and completely unrelated to Ms. Sloan's seizure disorder, for Colonial to expect her to be proficient in her job prior to her supervisor going on leave.

major life activity of working because the employer hired her knowing of her condition). Furthermore, the undisputed evidence that Colonial hired another individual with an epileptic disorder after Ms. Sloan vacated her position militates against a finding that Colonial regarded Ms. Sloan as disabled. Therefore, because she cannot establish that Colonial perceived her as having a disability within the meaning of the ADA, Ms. Sloan cannot prove a prima facie case of disability discrimination, and summary judgment is due to be granted.

### B. Pretext.

Even if Ms. Sloan could establish a prima facie case of disability discrimination, Colonial has articulated a legitimate, non-discriminatory reason for her termination: by her own admission, she could not perform all the job duties required of an assistant property manager. Therefore, Ms. Sloan must come forward with evidence from which a reasonable factfinder could conclude that the reason given by Colonial is mere pretext for disability discrimination. *Chapman*, 229 F.3d at 1024. Ms. Sloan provides no evidence or argument to establish pretext. Indeed, her own deposition testimony indicates that she was terminated for her inability to perform the tasks required in the assistant property manager job, and not because Colonial perceived her as being disabled. (Sloan Dep. at 159.) Upon careful review of the record, the court can find no evidence to support a finding that Colonial's articulated reason for terminating Ms. Sloan is mere pretext for discrimination. Therefore, even if Ms. Sloan had established a prima facie case, summary judgment would be due in Colonial's favor.

## V. Conclusion.

For the foregoing reasons, the court is of the opinion that the motion for summary judgment is due to be granted, and the plaintiff's claim is due to be dismissed. The court will enter an appropriate order in conformity with this memorandum of opinion.

Done, this 3rd of June, 2003.

L. Scott Coogler
United States District Judge